PERINGTON WHOLESALE, INC., Plaintiff,

v.

BURGER KING CORPORATION, Davmor Industries, Inc., and Carpenter Paper Company of Nebraska, Defendants.

Civ. A. No. 74–M–1103.

United States District Court, D. Colorado.

Dec. 13, 1982.

Martin Zerobnick, Brenman, Epstein, Zerobnick, Raskin & Friedlob, P.C., Denver, Colo., for plaintiff.

Harry Hobson, Holland & Hart, Denver, Colo., for defendants, Burger King Corp. and Davmor Industries.

Alan M. Loeb, Davis, Graham & Stubbs, Denver, Colo., for defendant, Carpenter Paper Co.

MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

In the complaint which initiated this civil action, filed November 26, 1974, the plain-

tiff alleged that the defendant Davmor Industries, Inc. ("Davmor") had terminated a written agreement, dated January 22, 1973, whereby the plaintiff, as wholesaler, agreed to purchase goods and merchandise from Davmor for resale to Burger King restaurants, and that such termination resulted from acts in violation of Sections 1 and 2 of the Sherman Act, and Sections 2 and 3 of the Clayton Act. The complaint alleged that the agreement was cancelled because the plaintiff was not complying with a "tie in" requirement that the plaintiff purchase "Sweetheart" cups from Davmor, that upon information and belief all of the defendants conspired to cancel the agreement and that the actions of the defendants constituted an attempt to monopolize a part of trade and commerce among the several states.

An amendment to the complaint was filed July 18, 1975, adding allegations, on information and belief, that the defendant Carpenter Paper Company ("Carpenter") entered into an illegal arrangement with the other named defendants before termination of the plaintiff's contract and that the purpose and intended effect of that arrangement was to "restrain and prevent further activity by plaintiff in the relevant market." It further alleged that "because of the said arrangement, trade has been restrained and competition lessened in the market for cups bearing a Burger King logo," and "that the said arrangement is an attempt to monopolize the right to supply Burger King franchises and retail stores."

A second amendment to the complaint, filed December 17, 1976, asserted that the plaintiff had been denied the right to purchase specific "promotional items" which were alleged to be tied to "Sweetheart" brand paper cups.

At hearings on defendants' motions, the plaintiff's counsel failed to satisfy me that there was a sufficient factual basis for finding any liability under the various statutes cited. Accordingly, I granted a motion to dismiss under Fed.R.Civ.P. 12(b)(6), filed by Carpenter, because of inadequate allegations of its participation in any conspiracy, and I granted the other defendants' motion for partial summary judgment on the tying claims. Additionally, I issued a final order dismissing the entire action as to all defendants because I had grown impatient with the continued failure to articulate the specific claims for relief and the factual bases for them.

The Tenth Circuit Court of Appeals affirmed the partial summary judgment dismissing the tying claims because of the failure of the plaintiff to come forward with any proof. The appellate court also affirmed the dismissal of claims brought against Carpenter and Burger King for an "attempt to monopolize" in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Court of Appeals reversed the dismissal of the "conspiracy to monopolize" claim under Section 2 of the Sherman Act; the conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and an alleged exclusive dealing arrangement in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. In the opinion, reported as *Perington Wholesale, Inc. v. Burger King Corporation,* 631 F.2d 1369 (10th Cir.1979), the Tenth Circuit very generously construed the plaintiff's pleadings and gave the plaintiff a primer on antitrust law, outlining what could be bases for recovery if the plaintiff had an adequate opportunity to pursue discovery and develop factual support for these claims.

I have obeyed the mandate from the Court of Appeals and patiently waited for the plaintiff to show that its claims are not as chimerical as they appear.

The defendant Carpenter has now filed a motion for summary judgment of dismissal of the claims against it. After reviewing that motion and the discovery record identified in the appendix to this opinion, and after hearing the statements of the plaintiff's counsel at the hearing on the motion, I am persuaded that the plaintiff's allegations on "information and belief" are based on nothing more than speculation and conjecture. That is insufficient to meet the challenge posed by the motion under Rule 56 and, accordingly, summary judgment of dismissal should be granted as to the defendant Carpenter.

It is axiomatic that summary judgments in antitrust litigation are to be used sparingly and are seldom justified. *Perington Wholesale, Inc. v. Burger King*, supra, at 1378. However, "the mere allegations of a contract, a combination, or a conspiracy, for the purpose of restraining trade or commerce, and resulting damages, once rebutted, will not withstand summary judgment." *In Re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 440 (5th Cir.1982). *See also Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 553 n. 22 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981) and cases cited therein. Where the court has permitted extensive discovery, and where the requirements of Rule 56 are satisfied, the court may properly grant the motion in an antitrust setting. *Umdenstock v. American Mortgage and Inv. Co.*, 495 F.2d 589 (10th Cir.1974); *Natrona Service Inc. v. Continental Oil Co.*, 435 F.Supp. 99, 106 (D.Wyo.1977), *aff'd.*, 598 F.2d 1294 (10th Cir.1979). "Indeed, the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust laws often encompass a great deal of expensive and time consuming discovery and trial work, but also, . . . . the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation . . . If a trial would serve no useful purpose, summary judgment is proper." *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1167 (7th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). *See also Natrona Service, Inc. v. Continental Oil Co.*, 598 F.2d 1294, 1298 (10th Cir. 1979).

The plaintiff's suspicion that it was the victim of an illegal conspiracy has been generated primarily from two letters. On November 9, 1973, Glenn Conger, a Davmor official, wrote to Mr. Perington as follows:

It has come to my attention that you have not been buying Sweetheart cups. As an approved Wholesaler, the agreement stipulates that purchases of printed Burger King logos are to come through this office.

Your compliance will be appreciated.

The second letter, dated December 28, 1973, was written by John Kennard, Burger King District Manager, to Glenn Conger, stating:

As you know, we have had considerable problems with Perington Wholesale in the Denver Market. With the cooperation of several franchisees, we have made a proposal that Carpenter Paper Co. replace Perington as our supplier of paper products in this market as of February 1, 1974.

I have reviewed their prices, they appear to be competitive and in many areas, lower than what we are presently paying. Wally Orwall, franchisee, Pueblo, Colorado, vouches for their ability to service us fairly and in a timely manner based on several years experience in Omaha.

I hereby request that Carpenter Paper Company be recognized as an authorized Burger King distributor.

The inferences which the plaintiff seeks to draw are that it had entered into an exclusive dealing arrangement with Davmor; that the agreement was terminated because Perington failed to comply with the exclusivity requirement; that Carpenter conspired with Davmor and Burger King to cause that termination; that Perington was replaced by Carpenter because it willingly accepted the exclusivity arrangement, and that all of this had an anticompetitive effect. It was these possible inferences which caused the Court of Appeals to order this court to conduct further proceedings to see if the plaintiff could support its charges of misconduct.

A thorough evaluation of the record reveals that Carpenter, as moving party, has met its initial burden of establishing the absence of a genuine issue of material fact concerning its role in a Section 1 combination or conspiracy. Carpenter has adduced substantial evidence delineating the circumstances under which it became the Burger King distributor. This unrefuted evidence reveals the existence of legitimate, independent business considerations behind the Perington replacement decision.

It is fundamental learning that Section 1 of the Sherman Act does not prohibit independent business actions and decisions. *Modern Home Institute v. Hartford Ins.,* 513 F.2d 102, 108 (2d Cir.1975); *Schoenkopf v. Brown and Williamson,* 637 F.2d 205, 207 (3d Cir.1980). Hence, unless it is to be determined that a Section 1 combination or conspiracy exists upon negotiation and consummation of an "untainted" distributorship contract, competent evidence establishing that "the alleged conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds" must be presented. *Edward Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), *citing American Tobacco Co. v. U.S.,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). *See also Murdaugh Volkswagen, Inc. v. First National Bank,* 639 F.2d 1073, 1076 (4th Cir.1981). Indeed, when faced with the defendant's sufficient challenge to the existence of a conspiracy, Perington, to avoid summary judgment, must produce *significant probative evidence* demonstrating that a genuine issue of fact exists as to this element of its claim. *First National Bank of Arizona v. Cities Service,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Scranton Construction Co. v. Litton Industries Leasing Corp.,* 494 F.2d 778 (5th Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975); *Pan-Islamic Trade Corp. v. Exxon Corp., supra,* at 554. A review of the proffered conspiratorial "proof," and the inferences sought to be derived therefrom, reveals that the plaintiff has failed to meet its evidentiary burden.

As noted above, Perington places considerable reliance on the December 28, 1973 letter from Kennard to Conger. It is contended that this letter establishes that a Burger King franchisee, Wally Orwall, had a prior relationship with Carpenter and thus acted as a "link" in the Burger King-Carpenter combination or conspiracy. It is true that Carpenter successfully serviced Wally Orwalls' Burger King franchise in Omaha, Nebraska. It is also apparent that Orwall, dissatisfied with the Perington service, played an integral role in the recommendation, and subsequent initiation, of the Kennard-Carpenter relationship. However, this activity is consistent with a variety of non-conspiratorial motives behind the acquisition of business through the normal competitive process. The record strongly suggests that the Kennard-Carpenter relationship was engendered by Perington's admittedly inadequate service. No countervailing *facts* to the contrary have been proffered. Under these circumstances, the most probable inference derived from the Orwall "link" is that the Perington termination was precipitated by factors independent of an illegal combination or conspiracy. *See First National Bank of Arizona v. Cities Service, supra,* at 280. Indeed, an inference to the contrary, devoid of evidentiary premise and based solely on speculation, would be neither reasonable nor permissible. *Sweeney & Sons v. Texaco, supra,* at 111; *Roesch Inc. v. Star Cooler Corp.,* 671 F.2d 1168, 1172 (8th Cir.1982).

The remaining "evidence" of conspiracy consists solely of self-serving statements and unsubstantiated allegations. In his 1981 deposition, Mr. Perington asserts that his previous statements regarding Carpenter's complicity were incomplete and in need of greater "emphasis." He then summarily recounts conversations allegedly held with Kennard, Orwall, Moody and Lukas "confirming" the existence of the illegal Carpenter conspiracy. However, no documentation or other corroboration of these alleged conversations has been offered. Orwall, Moody and Lukas have not been deposed or otherwise formally examined in the eight years since the action was filed. Kennard, in a deposition initiated by Perington's attorney, makes no reference to any such discourse. Indeed, Perington concedes the absence of evidentiary support for these allegations. It asserts, however, that Kennards' denial of such anticompetitive discourse precludes summary disposition under the "credibility test." In effect, Perington relies on the disbelief of Kennards' denial as evidence of Carpenter complicity. These unsubstantiated allegations, obvious-

ly based on a "general feeling" or surmise concerning Carpenter's conceivable conspiracy role, cannot support an inference of concerted action or buttress other inferences of concerted action sought to be drawn from the plaintiffs' proffered "proof." *See Sweeney & Sons v. Texaco, supra,* at 114.

In short, the plaintiff, after eight years, has failed to produce any *significant probative evidence* from which the existence of a conspiracy may be inferred. The Supreme Court, under similar circumstances, has held that when discovery has failed to reveal any evidence to support the plaintiffs' claims, and the record contains an overwhelming amount of evidence which contradicts the plaintiffs' conspiracy allegations and poses a business judgment or other non-conspiratorial motive for the defendants' acts, the defendants are entitled to summary judgment. *First National Bank of Arizona v. Cities Service, supra.* Indeed, the *Cities Service* edict is controlling:

> To the extent that petitioners' burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank of Arizona v. Cities Service, supra,* at 289–290. *See also Natrona Service, Inc. v. Continental Oil Co., supra,* at 1298.

Even assuming, arguendo, that the Carpenter-Burger King relationship constituted a Sherman Act "combination or conspiracy," the record refutes the contention that the concerted action restrained trade.

"Section 1 of the Sherman Act, 15 U.S.C. § 1, does not necessarily prohibit a conspiracy to substitute a new distributor for an existing one." *Perington Wholesale, Inc. v. Burger King Corp., supra,* at 1373. *See also Craig v. Sun Oil,* 515 F.2d 221 (10th Cir. 1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). "Competition, the ward of the Sherman Act, may not suffer by such a substitution, and may, in fact, be enhanced. (citations omitted). If, however, the substitution is motivated by a desire to damage Perington or put it out of business, or the result is to *substantially lessen competition,* the Sherman Act is violated." (emphasis added). *Perington Wholesale, Inc. v. Burger King Corp., supra,* at 1373–1374.

The Tenth Circuit has consistently focused on anticompetitive effect. *Perington Wholesale, Inc. v. Burger King Corp., supra,* at 1373–1374; *Craig v. Sun Oil Co., supra,* at 223; (10th Cir.1975); *Perryton Wholesale v. Pioneer Distributing Co. of Kansas,* 353 F.2d 618 (10th Cir.1965). Indeed, its articulated position in this very case is dispositive:

> ". . . . [T]he reasonable construction [of the complaint] is that the termination was motivated by Davmor's desire to increase its share of the relevant market for paper cups. So viewed, the complaint must stand or fall upon whether there are factual allegations that if proved *tend to show an actual lessening of competition, a restraint of trade.* (emphasis added).

*Perington Wholesale, Inc. v. Burger King Corp., supra,* at 1374.

■ To prove an antitrust violation under the rule of reason, a plaintiff must show that the challenged acts or conduct adversely affected competition. This showing can only be made by evaluating the operation of the restraint in the context of defined geographic and product markets. *Dougherty v. Continental Oil Co.,* 579 F.2d 954, 962 (5th Cir.1978); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir.1975). In the case at bar, the plaintiff makes no attempt to define either of these relevant markets. It is apparent from the

exclusivity allegations, however, that the relevant product market is composed of both logoed and non-logoed franchisee supply products. Indeed, "exclusive supply" arrangements concerning these products are alleged to exist at both the wholesale (Davmor-Perington) and retail (Perington-franchisee) distribution levels. The existence of *retail* exclusivity, however, is requisite to recovery under this antitrust theory. "[I]f coercion is exercised by Davmor and Burger King to freeze out other suppliers, then there could be a substantial lessening of competition in the market for supplying the restaurants. But, if the restaurant managers are free to deal with Perington and others, on all items not available exclusively through Davmor, then there would not be a lessening of competition in violation of the antitrust laws." *Perington Wholesale, Inc. v. Burger King Corp., supra,* at 1375. Thus, under the Tenth Circuit analysis, even if Perington was terminated and replaced for its noncompliance with the "Sweetheart" or other exclusivity requirement, and assuming Carpenter acquiesced in such "anticompetitive" restrictions, no lessening of competition cognizable under the antitrust laws would exist if franchisees remain free to deal with other competitive wholesalers.

The plaintiff's inference of retail exclusivity is based on the following matters:

(1) Lists of "qualified" Burger King distributors, published by Burger King, showing only one distributor in any given geographic area;

(2) The December 28, 1973 letter from Kennard to Conger stating "[w]ith the cooperation of several franchisees, we have made a proposal that Carpenter Paper Co. replace Perington . . .";

(3) An internal memorandum from Gil Wymond to Ray Steck expressing concern over unauthorized product use by Denver area franchisees and stating, "[i]t seems that several of our franchisees are buying condiments from someone other than Perington, which, of course, shifts some of the blame from his direction.";

(4) A January 22, 1974 letter to several Burger King franchisees stating in pertinent part, "[e]ven though some of you had expressed no reason or desire to change purveyors, the agreement was cancelled for the following reasons . . ."

Based on these items, Perington asserts that the trier of fact could reasonably infer that Burger King required its franchisees to purchase restaurant supplies solely from its authorized distributors. Initially, this "retail exclusivity" was alleged to extend only to logoed products. The most recent allegations, however, extend the exclusivity ambit to condiments and other non-logoed products. A thorough evaluation of the record in the light most favorable to the plaintiff, however, reveals the tenuous nature of the exclusivity allegations.

On its face, the Perington-Davmor "Wholesale Agreement" states:

Wholesaler shall purchase and agrees to maintain an adequate supply of food and other supplies necessary for the operation of the Burger King restaurants in the designated area, *it being understood that such area is not exclusive in any sense and that no franchisee of Burger King Corporation is required to purchase any item whatsoever from Wholesaler.* (emphasis added).

The Carpenter-Davmor distribution contract was, by its terms, similarly non-exclusive. Consistent therewith is the March 11, 1971 Burger King-Perington correspondence stating in pertinent part:

Burger King Corporation does not consider that it has the legal right to tell franchisees the parties from whom they may purchase any items. Our only concern is that the items used in Burger King restaurants meet the Burger King specifications so that the Burger King trademark is not diluted or harmed in any manner.

Thus, the documentary evidence addressing the issue contradicts the plaintiff's position. In addition, the unrefuted testimony of John Ocker in his deposition was that Carpenter was not the only distributor to Burger King restaurants. Indeed, the testimony

of Mr. Perington himself is inconsistent with the assertion of "non-logo exclusivity."

Under these circumstances, and in light of the foregoing evidence to the contrary, it was incumbent on the plaintiff to produce substantial proof suggesting a tacit requirement of retail exclusivity. This the plaintiff has failed to do.

In support of its exclusivity allegations, the plaintiff places substantial reliance on the Wymond-Steck internal memorandum. "This [memorandum] could lead the trier of fact to conclude that the franchisees had to buy things as condiments only from the distributor, which at the time was Perington." When viewed in the totality of circumstances, however, the most reasonable inference derived from this letter supports non-exclusivity. As previously noted, Burger King has established product quality standards for its wholesalers and franchisees, the conformance with which Burger King, in the interest of trademark protection, is entitled to insist upon. See Kentucky Fried Chicken v. Diversified Packaging, 549 F.2d 368, 380 n. 11 (5th Cir.1977). Perington asserts nothing to the contrary. When franchisees purchase unauthorized products from Perington, it, as an authorized Burger King distributor, must assume part of the blame. Conversely, the franchisee purchase of unauthorized products from sources other than Perington, "of course, shifts some of the blame from his direction." Viewed in this context, the Wymond-Steck missive lends no support to the contention that competing suppliers were excluded from the market. Indeed, the contrary inference is compelled, i.e. because Burger King franchisees purchased condiments from alternative distribution sources, the Perington distributorship was non-exclusive.

The plaintiffs' remaining "evidence" simply reflects the business realities of a nationwide franchise system and is insufficient to support the exclusivity inferences sought to be derived therefrom. The alleged existence of only one "qualified distributor" in a given geographic market is of neutral significance. This fact, without more, intimates nothing with respect to the exclusion of competing suppliers. The correspondence advising of a change in the Burger King authorized distributorship is similarly non-revealing. Again, the fact of such change, and the franchisee's acquiescence thereto, intimates nothing with respect to tacit requirements of "retail exclusivity." Indeed, after eight years, no evidence, testimonial or otherwise, has been adduced indicating the extent of the purchases of supplies by the local franchisees from the authorized Burger King distributor.

■ In short, the plaintiff has produced nothing to support the assertion that the Burger King franchisees were required to purchase all of their supplies or, indeed any particular supplies, including logo items, from Perington, Carpenter, or any other distributor. The depositions of John Kennard, and John Ocker, contain unrefuted sworn testimony that Perington was a non-exclusive distributor; that Burger King became dissatisfied with Perington's performance for a variety of valid business reasons, including poor service and late delivery; that Mr. Kennard made the decision to replace Perington; that he sought proposals from two other distributors (including Carpenter), and ultimately selected Carpenter for valid business reasons, including the experience with Carpenter in Nebraska; that Carpenter distributed merchandise to Burger King outlets in Colorado for about a year and a half, and that Carpenter did not, during that time, adhere to any requirement that it use only "Sweetheart" paper cups.

Without evidence to contradict these facts, the plaintiff has not only failed to show any evidence of an illegal conspiracy, it has failed to show any lessening of competition in either the market for supplying the restaurants, or the market for obtaining logoed products available from sources other than Davmor, such as Solo cups.

Is there any evidentiary showing of support for the appellate court's concern for the possibility of a conspiracy to monopolize the market for the supplying of logoed pa-

per cups in Colorado and Wyoming? The plaintiff relies on an affidavit from Mr. Perington that the plaintiff, during the time of its distributorship, could purchase Solo cups cheaper than the Sweetheart cups and without incurring additional shipping costs. That affidavit does not contradict the sworn testimony that Carpenter bought and sold both Solo and Sweetheart brand logoed cups during the time that it sold to Burger King restaurants in Colorado and Wyoming.

In summary, during the eight years since the initiation of this action, the plaintiff has failed to come forward with any factual basis for any claim for relief against the defendant Carpenter Paper Company of Nebraska. The failure to satisfactorily show a "conspiracy or combination" or an "anticompetitive effect" precludes relief under Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. The Clayton Act claim is deficient due to the failure to show an "exclusive contract." 15 U.S.C. § 14. Consequently, Carpenter is now entitled to the entry of a judgment freeing it from these unsupported allegations of misconduct. There is no just reason for delay in the entry of a final judgment under F.R.C.P. 54(b). Accordingly, upon the foregoing, it is

ORDERED, that the motion for summary judgment filed by the defendant Carpenter Paper Company of Nebraska is granted with respect to all claims and the Clerk shall forthwith enter a final judgment that the plaintiff take nothing on its claims against this defendant, and that this defendant shall recover its costs upon the filing of a bill of costs within 10 days from the entry of such final judgment.

## APPENDIX

The discovery record which has been evaluated and considered in making the evidentiary determinations in the foregoing memorandum opinion consists of the following:

1. Deposition of A.L. Perington, June 8, 1976, and exhibits thereto;

2. Deposition of A.L. Perington, February 23, 1981, and exhibits thereto;

3. Deposition of John Kennard, April 27, 1981, and exhibits thereto;

4. Deposition of John Ocker, October 12, 1981, and exhibits thereto;

5. Plaintiff's Answers to Interrogatories, and exhibits thereto; .

6. Plaintiff's Answers to Second Interrogatories of Burger King Corporation;

7. Plaintiff's Supplemental Answers to Defendants Burger King's, Davmor's and Distron's First Interrogatories;

8. Plaintiff's Second Supplemental Answer to Defendants Burger King's and Davmor's First Interrogatories;

9. Plaintiff's Supplemental Answers to Second Interrogatories of Burger King;

10. Plaintiff's Response to Burger King's First Request for Admissions;

11. Plaintiff's Supplemental Response to Burger King's First Request for Admissions;

12. Affidavit of A.L. Perington, September 21, 1982.